CITY COUNCIL of the City and County of Honolulu, by its Special Committee of the Whole to Investigate the Kukui Plaza Urban Renewal Project, et. al., Plaintiffs-Appellees *v*. JAMES SAKAI, Director of Finance of the City and County of Honolulu, Defendant-Appellant

NO. 6357

OCTOBER 20, 1977

RICHARDSON, C.J., KOBAYASHI, OGATA, MENOR AND KIDWELL, JJ.

OPINION OF THE COURT BY KIDWELL, J.

We are again required to consider the propriety of the employment, by the City Council of the City and County of Honolulu (the "Council"), of advisers of its own selection to provide services which the executive department stands ready to provide. In an action brought to compel payment for legal services contracted for by the Council, judgment was entered for the plaintiffs and this appeal followed. We affirm.

The present litigation is an outgrowth of a complex series of dealings and relationships between public agencies and private business interests. The facts of this history, so far as relevant here, were found by the circuit court as follows: In 1972 the Honolulu Redevelopment Agency ("HRA"), a semi-autonomous agency, executed a contract with Ocean-side Properties, Inc. ("Oceanside") for the development of Block G (the Kukui Plaza Urban Renewal Project, hereinafter "Kukui"). Seventy-five percent of the land for the project had been acquired through a federal grant. The balance of 25% of the cost of the land had been provided by the City and County of Honolulu ("City"). After the land was acquired it was leased with Council approval from the City to the HRA for a period of 75 years at $1.00 per year. The land was then sublet with the Council's approval by the HRA to Oceanside at the same rate and a Development Agreement setting forth the various rights and obligations of these two parties was signed in 1972, and was approved by the Council. At the time that it approved the Development Agreement the Council apparent-ly was under the impression that Oceanside had agreed to convey 900 parking stalls in the project to the City and it was with this understanding that the Council approved the Master Sublease. HRA then monitored the project on behalf of the City until its functions were taken over by the City's Depart-ment of Housing and Community Development in January of 1975. The Department of Housing and Community Develop-ment then monitored the project for the City. On January 14, 1976, the mayor, acting upon the advice of the Corporation Counsel that Council approval was not necessary, signed a Condominium Conveyance Document which amended the terms of the 1972 Development Agreement, purporting to convey 900 parking stalls to the City, and to allow Oceanside to operate the parking stalls for the City for a period of up to 3 years or until Oceanside recovered 6% of the cost of the project, whichever occurred first. The Council then re-quested an opinion from the Corporation Counsel as to whether or not the mayor could sign the Condominium Conveyance Document without Council approval and on April 12, 1976, the Corporation Counsel issued an opinion

that Council approval of the Condominium Conveyance Document was not required.

On April 14, 1976, the Council by resolution designated its special committee of the whole as an investigative committee, and authorized and empowered the committee to conduct an investigation into the following issues:

(a) Whether the contract entered into by and between Oceanside Properties, Inc. and the Mayor of the City and County of Honolulu on January 14, 1976 altering the terms of the Lease Document dated June 21, 1972 by and between the CITY and the HONOLULU REDEVELOPMENT AGENCY is, in fact, legally valid and binding upon the CITY without the prior consent and authorization of the City Council; and

(b) Whether the City's best interest was promoted and looked after in the subject project.

By subsequent resolution, the Council included the following questions as part of the foregoing issue (b):

(1) Whether any official or employee of the City and County or any agency thereof, committed any act of negligence or misused or improperly benefitted from his or her official position, or committed any act which was unlawful, unethical or in any manner in violation of his or her oath of office or public duty, in connection with the Kukui Plaza Project; and

(2) Whether the City Council should review or amend its present policies or procedures regarding the monitoring of the actions of the City and County officials and/or employees and agencies involved in Housing Projects submitted to the City Council pursuant to Section IV. 14(m) of the Policy of the Council of the City and County of Honolulu regarding "Lease or Rental of Property of the City and County of Honolulu;"

(3) Whether the City Council should review and amend the City's present policies or procedures pertaining to non-competitive purchases and contracts in order to insure that no elected or appointed officer or employee shall use his official position to secure or grant special consideration, treatment, advantage, privilege or exemp-

tion to himself or any person beyond that which is available to every other person.

By a resolution adopted May 12, 1976, the Council found "that necessity exists for the employment of special counsel and staff based upon the magnitude and complexity of the facts and issues involved in the circumstances surrounding" the Kukui project. The resolution authorized the employment of the law firm of Hart, Leavitt & Hall (HL&H) as the Council's special investigative and hearing counsel and specified the rate of compensation, together with certain particulars of the manner in which the services were to be rendered and billed. HL&H were employed under an oral contract on May 3, 1976, prior to the adoption of the authorizing resolution. The Council proceeded with the investigation and HL&H rendered services for which bills were submitted to Defendant for payment out of City funds. Defendant refused payment and this action was brought by the Council and HL&H, as coplaintiffs, seeking declaratory and injunctive relief mandating such payment. The judgment determined that HL&H had rendered services pursuant to a valid employment by the Council and directed payment out of available appropriations.

At the time that the Council authorized HL&H's employment, the firm represented numerous plaintiffs in litigation against the City. The trial judge was asked to take judicial notice of the records in these cases and indicated that he would do so. The record before us does not disclose what files and records were noticed by the trial judge and we are thus confined for our knowledge of them to the findings of fact, which are not challenged. *Soley v. Star & Herald Co.*, 390 F.2d 364 (5th Cir. 1968). The trial court found as follows:

14. At the time that the City Council passed Resolution No. 172 authorizing the employment of the law firm, the firm represented numerous persons engaged in law suits against the City and County of Honolulu, making claims for monetary damages for alleged zoning violations and negligence of City officers and employees in various matters such as zoning, false arrest and imprisonment and failure to properly maintain and operate a

drainage ditch valve. When the Corporation Counsel moved to disqualify Mr. Hall and the law firm from representing almost all of the plaintiffs in *Melemanu Woodlands Community Association, et al. v. Frank F. Fasi, et al.*, in Civil No. 37166 in the Circuit Court of the First Circuit on July 28, 1976, the law firm informed the members of the City Council and the Special Committee of the Whole and all of the various persons having claims against the City whom the firm represents of the fact that it represented such persons and groups stating to the Council and the Special Committee of the Whole the names of persons whom it represents, the nature and amount of their claims, and the status of the cases and stating to the various plaintiffs whom it represents the nature and subject matter of the Kukui Plaza investigation. The City Council, the Special Committee of the Whole and the various plaintiffs having claims against the City whom the firm represents have all stated that they see no relationship between the respective matters in which the law firm represents them; that they believe that the law firm can continue to exercise its independent professional judgment and give them its undivided loyalty while representing all interests and that they desire the law firm to continue to represent them in connection with the matters in which the law firm is currently representing them.

Although not incorporated into the findings of fact, the record contains a written stipulation of the parties, approved by the trial judge, which included the following:

It is further stipulated by and between the parties hereto by and through their respective counsel that the disclosure made to the City Council relating to Hart, Leavitt and Hall's representation of plaintiffs in Civil No. 37166, *Melemanu Woodlands Community Association, Inc., et al. v. Frank F. Fasi, et al.* consisted of disclosure that the action was one for violations of zoning ordinances and General Plan and that plaintiffs were seeking approximately $6 million in damages. No disclosure was made of the fact that the *Melemanu* suit challenged the

validity of actions of the City Council acting in their legislative capacity, or that certain members of the City Council had at one time been named as defendants and that damages had been sought from them in their individual as well as official capacities, and that these defendants had been dismissed from the action when the City, through the Corporation Counsel, agreed that the City would be responsible for any damages arising from the acts of the City Council, although the members of the Council were aware of such facts. Also, no disclosure was made of the fact that plaintiffs in *Melemanu* are contending that the failure of the City Council to act in accordance with legal advice rendered to them by the Corporation Counsel constituted negligence.

In this appeal, Defendant advances two principal contentions. Firstly, he contends that the Council may employ legal counsel only when the Corporation Counsel is unable to provide the needed services by reason of a conflict of interest, which he asserts was not present when HL&H were employed. Secondly, he contends that the representation by HL&H of plaintiffs in litigation in which the City was the defendant rendered void the purported employment of the law firm as attorneys for the Council and barred payment for their services, notwithstanding the approval of the relationship on the part of the council. We conclude that neither contention is sustained by the record before us.

## I

It is not disputed that the Council was acting within its Charter powers in undertaking the investigation with respect to which HL&H were employed.[1] Subsection 5 of § 3-108 of the Honolulu Charter provides:

---

[1] This case presents a question which is fundamentally different from that which we considered in Akahane v. Fasi, 58 Haw. 74, 565 P.2d 552 (1977), where we held that the subject matter with respect to which the Council proposed to employ planning consultants was the primary responsibility of the executive branch and that the Council had not yet become empowered, by reason of lack of initiative or response from the executive branch, to undertake the development of a planning policy.

5. The council may authorize the employment of special counsel to represent it, upon the affirmative vote of at least two-thirds of its entire membership. Any such authorization shall specify the compensation, if any, to be paid such special counsel, and the council shall make an appropriation therefor.

Defendant does not here assert any inadequacy in the authorizing resolution or any defect in the employment contract, or any deficiency in the appropriation for payment. He argues that the Council, notwithstanding the apparently unqualified authorization in § 3-108.5, may employ special counsel only when the legal services sought by the Council cannot be provided by the Corporation Counsel because of a conflict of interest. In support of this argument, Defendant points to § 5-203 of the Charter:

*Powers, Duties and Functions*. The corporation counsel shall serve as the chief legal adviser and legal representative of all agencies, the council and all officers and employees in matters relating to their official powers and duties and he shall represent the city in all legal proceedings. He shall perform all other services incident to his office as may be required by this charter or by law.

Defendant acknowledges, in his brief, that although the Corporation Counsel is the legal adviser to and legal representative of the Council, in some circumstances the Council is authorized to retain special counsel to represent it. However, he contends that these circumstances are limited to situations in which the Corporation Counsel is disqualified to render the desired service. We are asked to read into § 3-108.5 certain comments allegedly contained in the final report of the Charter Commission to the City Council. Unfortunately for this argument, the record contains a copy of the letter of October 6, 1972 by which the final report of the Charter Commission was transmitted to the City Council, but does not contain the final report.[2] Under the circumstances,

---

[2] The record contains a tabloid newspaper supplement published as a legal notice in the Honolulu Advertiser on October 10, 1972, and entitled: "A Report to the People by the City Charter Commission." This is not the final report to which the Defendant attempts to refer.

it can play no part in resolving the questions presented by this appeal.

Section 3-108.5 of the 1973 Charter replaces a provision which appeared in the 1959 Charter as § 5-205.3, as follows:

> 3. The council may, by two-thirds vote of its entire membership, authorize the employment of special counsel for any special matter presenting a real necessity for such employment. Any such authorization shall specify the compensation, if any, to be paid for said services.

In the process of revision, the power of the Council was clearly enlarged, from one exercisable only "for any matter presenting a real necessity for such employment", to one exercisable without any express limitation. Defendant concedes that the Corporation Counsel would be disqualified to represent the Council, and the employment of special counsel would be authorized, in a court proceeding to test the validity of the contract which is the subject of issue (a) of the matter defined for investigation in the resolution of April 14, 1976, since the Corporation Counsel had given an opinion with respect to the contract. Nevertheless, Defendant argues that no such disqualification would exist with respect to issue (b), i.e., "whether the City's best interest was promoted and looked after in the subject project." His argument runs to the effect that the investigation thus launched by the Council would inquire into activities of both the executive and the legislative branches, and that the executive branch should participate in the investigation of itself if the Council were undertaking to investigate its own activities. We are told in Defendant's brief that "the executive and legislative branches, by each participating in the investigation with the other, can each act as a moderating influence on the other and avoid the abuses which might result if one branch were to have unrestricted authority over all parts of the investigation."

We find Defendant's analysis and contentions unconvincing on several grounds. The validity of the contract which is the subject of issue (a), as defined in the April 14, 1976, resolution, is at the heart of the investigation which the Council then undertook. The prior involvement of the Corporation

Counsel in that contract would, in our opinion, have rendered it impossible for that office to provide the disinterested advice and assistance which the Council required. The attempt of Defendant to divide the subject matter of the investigation so as to isolate the more general inquiry contemplated by subject (b) from the interest conflict inherent in subject (a) appears to us to be wholly impractical.[3] Without attempting to define precisely what limitations, if any, may properly be read into the grant of authority to employ special counsel contained in § 3-108.5, we conclude that the employment of HL&H was, on the record before us, amply supported by that authority.

## II

At the time of their employment by the Council, HL&H represented private clients in pending litigation against the City, seeking money judgments on claims about which we know only that they were "for alleged zoning violations and negligence of City officers and employees in various matters such as zoning, false arrest and imprisonment and failure to properly maintain and operate a drainage ditch valve." Certain claims (the *Melemanu* suit) were founded on alleged actions or nonaction of the Council in relation to zoning, including the alleged failure of the Council to act in accordance with legal advice from the Corporation Counsel, and sought approximately $6,000,000 in damages. HL&H did not disclose their representation of these plaintiffs to the members of the Council at the time of their employment. About one week before the expiration of the first three months of HL&H's employment, counsel for the City moved to disqualify HL&H as attorneys for the plaintiffs in the *Melemanu* suit, which motion was eventually denied. Upon the filing of that

---

[3] It was found by the trial court that, during the progress of the investigation, the Corporation Counsel has represented and advised members of the executive branch appearing as witnesses at hearings, has advised certain witnesses to refuse answers to questions and has taken the position that the Council was without power to investigate the Kukui project.

motion, HL&H informed the members of the Council, who also constituted the membership of the special committee of the whole, of the names of the persons represented, the nature and amounts of their claims and the status of the cases. This disclosure did not include the fact that the *Melemanu* suit was premised upon conduct of the Council, but this fact was known to the members of the Council. HL&H did not disclose, and we are not aware from the record whether the members of the Council knew, that certain claims in the *Melemanu* suit were premised upon alleged failure of the Council to act in accordance with the advice of the Corporation Counsel.

The Council and its members responded to these disclosures by, in effect, approving the continuation of HL&H's employment. The plaintiffs in the various pending actions against the City did the same. The record tells us nothing about the subsequent course of these actions, and we assume HL&H continued to prosecute them actively while continuing to render to the Council the services for which the present action seeks payment. Defendant contends that, notwithstanding such approval, the conflicting loyalties and obligations arising out of their representation of their private clients so affected the ability of HL&H to serve the Council that they should be held to have forfeited all compensation and expenses claimed in this action.

It is not contended that HL&H advised the Council on any matter involved in the pending actions or misused any information acquired in their employment. HL&H did not, so far as we are aware from the record, represent the Council in any court proceeding. No misconduct on the part of HL&H is pointed to, other than their undertaking professionally to serve persons whose interests were in opposition to that of the City in unrelated matters. It is argued that the potential for harm which is inherent in such relationships, especially where the public interest is involved, is so great that a prophylactic rule is required which both condemns the relationship and imposes the sanction of disallowance of compensation.

The Code of Professional Responsibility, which was binding on HL&H by rule of this court, describes the ethical

considerations involved in the representation of multiple clients in the following language:

EC 5-1 The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of compromising influences and loyalties. Neither his personal interests, the interests of other clients, nor the desires of third persons should be permitted to dilute his loyalty to his client.

EC 5-14 Maintaining the independence of professional judgment required of a lawyer precludes his acceptance or continuation of employment that will adversely affect his judgment on behalf of or dilute his loyalty to a client. This problem arises whenever a lawyer is asked to represent two or more clients who may have differing interests, whether such interests be conflicting, inconsistent, diverse, or otherwise discordant.

EC 5-15 If a lawyer is requested to undertake or to continue representation of multiple clients having potentially differing interests, he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues the employment. He should resolve all doubts against the propriety of the representation. A lawyer should never represent in litigation multiple clients with differing interests; and there are few situations in which he would be justified in representing in litigation multiple clients with potentially differing interests. If a lawyer accepted such employment and the interests did become actually differing, he would have to withdraw from employment with likelihood of resulting hardship on the clients; and for this reason it is preferable that he refuse the employment initially. On the other hand, there are many instances in which a lawyer may properly serve multiple clients having potentially differing interests in matters not involving litigation. If the interests vary only slightly, it is generally likely that that the lawyer will not be subjected to an adverse influence and that he can retain his independent judgment on behalf of each client; and if the interests become

differing, withdrawal is less likely to have a disruptive effect upon the causes of his clients.

These statements represent objectives and express principles designed to provide guidance. The Code also contains disciplinary rules which state a minimum level of conduct which will be enforced by disciplinary action. The disciplinary rules which apply to the present case follow:

DR 5-105 Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.

(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105(C).

(C) In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

Although these disciplinary rules establish only minimum standards and may not foreclose the weighing of other considerations, our first inquiry must be whether the record before us discloses a violation of the code of conduct which we have mandated. We think it does not. The critical question is whether, when HL&H was offered employment by the Council, their independent professional judgment would be or was likely to be adversely affected by the existence of their professional obligations to their private clients. There is nothing to suggest that the investigation with respect to which they were employed would touch in any way upon the subject matters of the pending actions. We do not see a material difference between representation of the City and representation of the Council. Nevertheless, the fact that the representation of the Council by HL&H placed them in a direct relationship only with the legislative department of the

City tended to minimize the possibility that their independent professional judgment on behalf of the Council might be affected by what course the litigation against the City might take. Defendant suggests that the fiscal powers of the Council might involve it in the approval of settlements of the pending actions. However, any such question would be clearly outside the scope of HL&H's employment. While a "worst case" situation might possibly be imagined in which their responsibilities to their private clients would impact on their relationship with the Council, we cannot say that when HL&H accepted employment by the Council there existed any likelihood that this would occur. Neither can we say, on the record before us, that such a likelihood existed at any time during the employment.

We must draw attention to the significant fact that HL&H were not called upon to represent the Council or the City in litigation, other than in the present action relating only to their compensation. As is pointed out in EC 5-15, a lawyer may properly serve multiple clients having potentially differing interests more freely in matters not involving litigation. We do not express disagreement with those courts which have found it impossible for an attorney to provide to his client undivided loyalty as his advocate and champion in litigation while owing the same obligation to his client's opponent in unrelated litigation. Thus a law firm has been held disqualified to represent a client in one lawsuit where one of its partners was also a partner in another law firm which represented the client's opponent in an unrelated lawsuit. *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384 (2nd Cir. 1976). *Also see Grievance Committee of the Bar of Hartford County v. Rottner*, 152 Conn. 59, 203 A.2d 82 (1964); *In re Kushinsky*, 53 N.J. 1, 247 A.2d 665 (1968); *Memphis & Shelby County Bar Association v. Sandersan*, 52 Tenn. App. 684, 378 S.W.2d 173 (1963); *Jeffry v. Pounds*, 67 Cal. App. 3d 6, 136 Cal. Rptr. 373 (1977).

The view which we have taken of this question has made it unnecessary to consider the effect of the purported approval by the Council of HL&H's representation of their private clients. The facts with respect to the adequacy of HL&H's

disclosure to the Council are meager in this record. If approval by the Council were necessary to sustain the claim of HL&H for payment for their services, a troublesome question would exist whether the burden of showing such approval after full disclosure had been met. We would have a further troublesome question whether the approval required by DR 5-105(C), in cases in which the propriety of representation of multiple clients rests on such approval, can effectively be given by a public officer or body. See *In re A. and B.*, 44 N.J. 331, 209 A.2d 101 (1965). These questions do not require decision at this time, but the expression of our doubt will serve as a caveat that further consideration, in an appropriate case, may lead to our adoption of the view of the New Jersey court that "an attorney may not represent both a governmental body and a private client merely because disclosure was made and they are agreeable that he represent both interests." 209 A.2d at 102.

We thus conclude that the acceptance by HL&H of employment by the Council, as disclosed by this record, was consistent with the minimum standard established by the disciplinary rules contained in the Code of Professional Responsibility. The record in this case does not suggest to us that disregard by HL&H of any other relevant ethical considerations prejudiced the Council or was sufficiently culpable to warrant the sanction which Defendant proposes. It follows that HL&H did not forfeit their compensation for services in such employment as the result of a breach of their professional obligations. Nevertheless, we call attention to the aspirational standards contained in EC 5-16:

> EC 5-16 In those instances in which a lawyer is justified in representing two or more clients having differing interests, it is nevertheless essential that each client be given the opportunity to evaluate his need for representation free of any potential conflict and to obtain other counsel if he so desires. Thus before a lawyer may represent multiple clients, he should explain fully to each client the implications of the common representation and should accept or continue employment only if the clients consent. If there are present other circumstances that

might cause any of the multiple clients to question the undivided loyalty of the lawyer, he should also advise all of the clients of those circumstances.

Proper regard for this standard should have resulted in full disclosure to the Council by HL&H, at the time that employment was offered, of all of the facts and implications of their representation of claimants against the City. By concluding as we have in this case, we do not condone this oversight.

The judgment is affirmed.

*Randolph R. Slaton,* Deputy Corporation Counsel, for Defendant-Appellant.

*David W. Hall* and *William Hunt (Hart, Leavitt & Hall* of counsel) for Plaintiffs-Appellees.