MARCEL LUSSIER, Plaintiff-Apellant, *v.* MAU-VAN DEVELOPMENT, INC., WILHELM KAINZ, NICK GERMANI, SOPHIE KOENIG, CURT SCHLAMANN, ARNOLD HONIGMAN and GERRY HELFRICH, Defendants-Appellees

NO. 8309

(CIVIL NO. 4294)

JULY 21, 1983

BURNS, C.J., HEEN AND TANAKA, JJ.

OPINION OF THE COURT BY TANAKA, J.

Plaintiff Marcel Lussier (Lussier)[1] appeals from the adverse judgment entered in a shareholder's derivative action. We affirm in part and reverse in part.

The issues on appeal and our answers are:

1. Whether the trial court erred in granting partial summary judgment dismissing certain of Lussier's claims. No.

2. Whether the trial court erred in granting directed verdicts in favor of defendants-appellees. Yes and no.

3. Whether the trial court erred in denying Lussier's motion in limine to exclude evidence of his motives in filing the instant

---

[1] The full name of plaintiff-appellant is Joseph Roger Marcel Lussier, also known as Pete Lussier. Deposition of Joseph Marcel Lussier at 3 (November 25, 1980).

action.[2] No.

4. Whether the trial court's failure to disqualify the law firm of Ueoka & Luna from acting as counsel for any defendant in the case is an independent ground for reversal of the judgment. No.

Defendant Mau-Van Development, Inc. (Mau-Van), a Hawaii corporation, was incorporated on August 12, 1976. Mau-Van is capitalized for $580,000 with 58,000 shares of $10 par value stock issued and outstanding. There are 18 shareholders of Mau-Van, most of whom are Canadian citizens or nationals residing in Canadá.

Mau-Van purchased Lots 15 and 16, two parcels of land in Kihei, Maui, for $1,100,000. Lot 16 is a 3.78-acre parcel on which the 127-unit Kihei Alii Kai condominium project (the Project) was built. After the completion of the Project, Mau-Van intended to develop a commercial complex on Lot 15, a one-acre parcel.

In furtherance of the Project, in September 1977, Mau-Van obtained from the Honolulu Federal Savings and Loan Association (Honfed) an interim construction loan commitment of $5,600,000 and a permanent "take-out" loan commitment of $6,000,000. On September 6, 1977, the State Real Estate Commission issued the Preliminary Horizontal Property Regimes (Condominium) Public Report for the Project, thus permitting sale of the Project units prior to construction.

---

[2] Point of error no. 3 in Plaintiff-Appellant's Amended Opening Brief filed on July 23, 1982 states:

    3. The trial court erred in allowing evidence of Lussier's alleged motives and in excluding from evidence documents and testimony concerning a written lease given to First Kihei Realty and condition 4 in the Kainz counteroffer to buyer Charles Taylor III on the one-acre commercial parcel.

Point of error no. 3 clearly violates Rule 3(b)(5), Rules of the Supreme Court of the State of Hawaii (1979), which requires the inclusion of "a quotation of the grounds urged at the trial for the objection, and the full substance of the evidence admitted or rejected." Thus, we will not consider on appeal the issue relating to the exclusion of documentary and testimonial evidence. *Johnson v. Robert's Hawaii Tour, Inc.,* 4 Haw. App. 175, 664 P.2d 262 (1983); *State v. Napoleon,* 2 Haw. App. 369, 633 P.2d 547 (1981).

On March 15, 1978, the building permit was issued for the Project. On April 21, 1978, there was a closing of the Honfed interim construction loan. The formal ground breaking ceremony was held on May 4, 1978 and construction of the Project began. In August 1979, the Project was substantially completed and the Project escrow began closings of the units sold.

On August 29, 1979, Lussier filed a shareholder's derivative action. Lussier is the owner of 3,500 shares of stock and a director and secretary of Mau-Van. He alleges that he is bringing the derivative action "on behalf of himself and other minority shareholders, including Franz Giegerl (holder of 6,000 shares), Jo-Ann Schwarzinger (holder of 2,000 shares), Walter Walcher (holder of 2,000 shares), and Elwin Evans (holder of 1,500 shares)."

The amended complaint filed on September 24, 1980 names seven defendants: (1) Mau-Van; (2) Wilhelm Kainz (Kainz), shareholder, director, president, and general manager; (3) Nick Germani (Germani), shareholder; (4) Sophie Koenig (Koenig), shareholder; (5) Curt Schlamann (Schlamann), shareholder, director, and vice president; (6) Arnold Honigman (Honigman), shareholder and director; and (7) Gerry Helfrich (Helfrich), shareholder and former director.[3] Lussier charges Kainz, as dominant director and officer of Mau-Van, with breach of fiduciary duty, mismanagement, appropriation of corporate opportunity for personal profit, use of corporate funds for personal gain, and malicious and oppressive acts entitling plaintiff to punitive damages. Germani and Koenig, as shareholders, together with Kainz, are alleged to have reaped profits from the purchase and sale of certain Project units which rightfully belong to the corporation. Directors Schlamann and Honigman are alleged to have been "dominated, influenced, and controlled" by Kainz and committed "ultra vires acts" by voting for a monthly salary and car and gas allowance for Kainz. As with Kainz, Schlamann is charged

---

[3] Max Sovdat, Peter DiIorio, and Title Guaranty Escrow Services, Inc., who were named as defendants in the original complaint, were not designated as defendants in the amended complaint.

with having executed and delivered a lease to First Kihei Realty, Inc. (First Kihei) without authority. It is not clear from the amended complaint what the charges are against former director Helfrich.

On January 5, 1981, the day the jury trial of the case was to begin, Kainz filed a motion for partial summary judgment as to seven of the claims. After an immediate hearing, the trial court granted summary judgment in favor of Kainz on four of the seven claims covered by the motion.

On the same day, Lussier orally moved (1) to sever the claim based on the alleged negligence of Kainz in "supervising and making decisions with respect to the plans and drawings for the [Project] and its construction" (paragraph 8(c) of the amended complaint) and (2) to bifurcate as to liability and damages the claim based on the First Kihei lease. The reasons for the motion were the pending arbitration or legal proceedings between Mau-Van and the Project architect and/or the general contractor and the pending lawsuits between Mau-Van and First Kihei and/or its agent. The trial court severed both claims from the trial for later disposition.

After 22 days of trial, on February 4, 1981, Lussier completed his case-in-chief and rested. Kainz moved for a directed verdict in which all other defendants joined. The trial court granted the motion and a judgment in favor of all defendants was entered on February 13, 1981.

Lussier's motion for a new trial and to vacate the partial summary judgment was denied on March 9, 1981. Lussier's timely appeal followed.

## I. PARTIAL SUMMARY JUDGMENT

Lussier contends that the trial court erred in granting in part Kainz's motion for summary judgment. He argues that the trial court heard the motion in violation of the notice requirement of Rule 56(c), Hawaii Rules of Civil Procedure (HRCP) (1981). Alternatively, Lussier claims that summary judgment was improper because genuine issues of material fact were extant as to the claims involving (1) Lots 19 and 20 and (2) the

Maluna Kai and Maui Meadows lots, described *infra.*[4] *See* Rule 56(c), HRCP (1981); *Fernandes v. Tenbruggencate,* 65 Haw. 226, 649 P.2d 1144 (1982); *King v. Ilikai Properties, Inc.,* 2 Haw. App. 359, 632 P.2d 657 (1981). Lussier's contentions are without merit.

### A. *Notice Requirement*

The record shows that an order filed on October 30, 1980 set the case for jury trial to commence on January 5, 1981. On October 31, 1980, Kainz filed a motion for summary judgment which was denied on November 10, 1980. Thereafter, the attorneys in the case were busy taking the depositions of parties and witnesses. On December 22, 1980, Kainz served and filed a pre-trial statement wherein he stated:

On November 10, 1980, Defendant KAINZ's Motion for Summary Judgment was denied. However, at the time this Motion was denied, only very minor discovery had been taken in this action. After discovery is completed, KAINZ intends to renew his Motion. [Record at 2607.]

Lussier completed taking Kainz's deposition on December 31, 1980.

On January 5, 1981, the opening day of the trial, Kainz filed his motion for partial summary judgment at 7:59 a.m. At 2:37 p.m. that day, the trial court commenced a hearing on Kainz's motion. Lussier's attorney interposed no objection. In fact, he argued quite extensively against the motion. Only after the trial court orally granted summary judgment on the claim involving Lots 19 and 20 did Lussier's attorney object thusly:

Your Honor, if I may interject, we now have a procedural problem, I think, because I've been served with this motion for summary judgment this morning. There's been no notice obviously. I had not had time to file counter-

---

[4] In addition to the claims involving Lots 19 and 20 and the Maluna Kai and Maui Meadows lots, the trial court granted summary judgment in favor of Kainz on Lussier's claims that (1) Kainz neglected to devote to Mau-Van's affairs the time required by his duties as president and chief executive officer of the corporation and (2) Kainz appropriated portions of the construction contract for the Project as a subcontractor. Lussier has abandoned his appeal concerning the latter two claims.

affidavits. [Transcript of January 5 - February 4, 1981 Proceedings (Tr.) at 32.]

The trial court did accord Lussier's attorney an opportunity to file counter-affidavits, but none was filed.

Rule 56(c), HRCP, includes a 10-day notice requirement.[5] Compliance with the literal requirement of the rule is not required. *Shelton Engineering Contractors, Ltd. v. Hawaiian Pacific Industries, Inc.,* 51 Haw. 242, 456 P.2d 222 (1969); *Guaschino v. Eucalyptus, Inc.,* 3 Haw. App. 632, 658 P.2d 888 (1983). Furthermore, under certain circumstances, the technical requirements of the rule may be waived. *Hoopes v. Equifax, Inc.,* 611 F.2d 134 (6th Cir. 1979) (where motion was granted on the first day of trial following earlier pretrial conference, and before granting oral motion, the trial judge questioned non-movant's counsel in detail and afforded him opportunity to show genuine issue of material fact, granting of summary judgment before expiration of 10-day notice period is not reversible error since non-moving party did not demonstrate prejudice); *Thacker v. Whitehead,* 548 F.2d 634 (6th Cir. 1977) (non-moving party participated in oral argument, did not request additional time to file counter-affidavits, and failed to indicate to the court that any additional time was needed.); *Spence v. Latting,* 512 F.2d 93 (10th Cir.), *cert. denied,* 423 U.S. 896, 96 S. Ct. 198, 46 L.Ed.2d 129 (1975) (non-movant actively participated in oral argument and made no specific allegation of prejudice).

Here, Lussier's attorney failed to object when the trial court commenced to hear Kainz's motion, actively participated in the oral arguments, and failed to file any counter-affidavit despite being given the opportunity to do so. Further, Lussier has failed to show any harm to him due to the lack of notice. *See Jensen v. Pratt,* 53 Haw. 201, 491 P.2d 547 (1971) (absent showing of harm, failure of trial court to comply with 10-day requirement is not reversible error). We hold that Lussier

---

[5] Rule 56(c), Hawaii Rules of Civil Procedure (1981), provides in pertinent part, "The motion shall be served at least 10 days before the time fixed for hearing."

waived his right to the 10-day notice requirement. *See Spence v. Latting, supra.*

### B. *Lots 19 and 20*

At the time Kainz filed his motion for partial summary judgment the record disclosed the following undisputed material facts. In conjunction with the purchase for Lots 15 and 16, Mau-Van had a right of first refusal on Lots 19 and 20, which contained a total area of 6.924 acres and adjoined the Project. On November 30, 1978, the Trustees of Akina II Hui (Trustees), the owners of Lots 19 and 20, accepted a third party's offer to purchase the lots for $2,262,070.80, subject to Mau-Van's right of first refusal. The accepted offer required a cash down payment of $656,000 with a closing deadline of February 13, 1979. Mau-Van, through Kainz, was notified that it had until January 15, 1979 to exercise its right of first refusal which required Mau-Van to match the third-party's offer. The exercise of the right required a cash deposit of $15,000.

On January 12, 1979, on behalf of Mau-Van, Kainz exercised the right of first refusal by submitting the Deposit, Receipt, Offer, and Acceptance (DROA) form for the purchase of Lots 19 and 20, together with a deposit of $15,000 from his own personal funds, which the Trustees accepted. Under the DROA, the closing date was March 1, 1979.

In early 1979, Mau-Van did not have $656,000 in cash nor the ability to borrow such amount. In his deposition, Lussier himself testified that he had no information to believe that Mau-Van could have come up with $656,000 on March 1, 1979. On March 1, 1979, Mau-Van assigned its interest in the DROA to Kainz. In the amended complaint, Lussier alleges that Kainz was a general partner of Trans-Am, a limited partnership, and the Trustees sold Lots 19 and 20 to "companies called Buckingham and Trans-Am" in March 1979.

Lussier charges Kainz with having usurped Mau-Van's corporate opportunity by his actions. He claims that any benefit or profit Kainz realized from the acquisition of Lots 19 and 20 belongs to Mau-Van.

The doctrine of corporate opportunity is explained in the leading case of *Guth v. Loft, Inc.*, 23 Del. Ch. 255, 5 A.2d 503 (1939), as follows:

> [I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself.

*Id.,* 23 Del. Ch. at 272-73, 5 A.2d at 511. *See also* 3 W. Fletcher, *Cyclopedia of the Law of Private Corporations* (hereinafter "Fletcher") § 861.1 (rev. perm. ed. 1975); 19 Am. Jur. 2d *Corporations* § 1311 (1965); V. Brudney & R. Clark, *A New Look at Corporate Opportunities,* 94 Harv. L. Rev. 997 (1981). In essence, the doctrine "prohibits a director or officer from appropriating to himself a business opportunity which in fairness should belong to the corporation." *Toledo Trust Co. v. Nye,* 392 F.Supp. 484, 487 (N.D. Ohio 1975).

The doctrine as stated is inapplicable if the opportunity is one which the corporation is financially incapable of undertaking. *See Wolfensohn v. Madison Fund, Inc.,* 253 A.2d 72 (Del. 1969); 3 Fletcher, *supra,* § 862.1. The authorities are divided, however, as to whether corporate financial inability *per se* absolves a director or officer from liability for appropriating a corporate opportunity to himself. *See* Annot., 16 A.L.R. 4th 185 (1982). On one extreme, in applying Massachussetts law, the court indicated in *W.H. Elliott & Sons Co. v. Gotthardt,* 305 F.2d 544, 547 (1st Cir. 1962), that financial inability would be no defense to directors and that if directors are uncertain whether the corporation can make the necessary outlays, they need not undertake the venture, but if they do so, "they may not substitute themselves for the corporation any place along the line and divert possible benefits into their own pocket." On the other hand, in *A. C. Petters Co. v. St. Cloud Enterprises,* 301 Minn. 261, 222 N.W.2d 83 (1974), the court held that an opportunity to purchase a tract did not constitute a corporate opportunity where the corporation was financially unable to avail itself of the business opportunity.

We hold that there is no corporate opportunity if (1) the corporation is financially unable to undertake it and (2) before

a director or officer seizes such opportunity for himself, he discloses the opportunity to the shareholders and obtains their consent to the acquisition of the opportunity and such action is not detrimental to the corporate creditors. *See Hill v. Hill,* 279 Pa. Super. 154, 420 A.2d 1078 (1980).

The record in this case shows that not only was Mau-Van financially incapable of purchasing Lots 19 and 20, but also that Kainz had disclosed the opportunity of such purchase to the shareholders and impliedly obtained their consent to his acquiring the lots and that Kainz's action did not prejudice Mau-Van's creditors.

Rudolph Hensel (Hensel) is a shareholder of Mau-Van and served as a director at one time. He was not a minority shareholder in Lussier's camp nor was he a defendant named in the derivative suit. When his deposition was taken, he tesitified as follows:

Q [By Lussier's Counsel] Did you make any statement to Mr. Kainz as to how you felt?

A Yes, as I said already that I felt that Mau-Van, that we as directors, should give the shareholders a chance, approach them and see if Mau-Van can play as a partner in the new project [with respect to Lots 19 and 20].

\* \* \* \* \*

Q What did he respond to that?

A Well, he responded that this was not practical because of the shareholders' position that they did not want to invest any more money and some were incapable of investing.

\* \* \* \* \*

Q Did you think that there should have been a shareholders' meeting called?

A I recall that we had one shareholders' meeting that Mr. Kainz stood up and said to the shareholders that parcel 19 and 20, the option [sic] is running out and if we can come up with the money then we should come up with it, otherwise he would go ahead with this new company.

* * * * *

Q   And was that an official meeting of some kind?
A   Yes.
Q   A shareholders' meeting?
A   Shareholders' meeting, yes.

Deposition of Rudolph Hensel at 13-14 (November 17, 1980).

Hensel's testimony is uncontroverted. Thus, the record shows a disclosure made by Kainz to the shareholders. It is also undisputed that the shareholders failed to object to Kainz's acquisition of Lots 19 and 20. The only reasonable inference from such facts is an implied consent by the shareholders.

Concerning the Lots 19 and 20 transaction, we hold that there was no genuine issue of material fact and that Kainz was entitled to summary judgment as a matter of law.

### C. *Maluna Kai and Maui Meadows Lots*

The following facts are not in dispute. Kainz subscribed for 5,000 shares of Mau-Van stock at the subscription price of $50,000. He also subscribed for 3,000 shares at $30,000 for his son Edgar. In 1976, Kainz paid $6,500 on his stock subscription account ($3,500 in cash and $3,000 as credit for architectural fees paid to Uwe Schultz), leaving an unpaid balance of $43,500. He paid $3,000 for Edgar's subscription leaving a balance of $27,000 unpaid.[6]

Lussier testified when deposed that, although there was nothing in writing, the due date for payment of all stock subscriptions was sometime in March 1977. He further testified that in May 1977 Kainz purchased three lots in the Maluna Kai subdivision in Napili, Maui. In 1977 Kainz also purchased two lots in the Maui Meadows subdivision in Kihei, Maui. Kainz improved all five lots with residential buildings, sold four of them, and made substantial profits. Kainz retained a Maui Meadows lot and improvement for his personal use.

Based on the foregoing facts, Lussier claims that (1) since

---

[6] Exhibit A-16 introduced into evidence at trial shows that Kainz's and Edgar's stock subscriptions were fully paid on March 2, 1978 and nothing was owing thereon on August 29, 1979, when Lussier commenced his derivative action.

Kainz was obligated to pay for the stock subscriptions in March 1977, the personal funds he used to pay for the five lots rightfully belonged to Mau-Van; (2) consequently, Kainz was a constructive trustee of the five lots for Mau-Van; and (3) Kainz is liable to Mau-Van for all profits realized and obligated to convey the remaining Maui Meadows lot and improvement to Mau-Van. In his opening brief, Lussier designates the basis of this claim as "misuse of corporate funds."

It is fundamental that directors and officers must use corporate funds for corporate purposes only or they will be liable for misappropriation, diversion, or conversion of corporate assets. 3A Fletcher, *supra,* § 1102 (rev. perm. ed. 1975). No citation of authority is required "to conclude that corporate funds simply cannot be used to meet an officer's personal desires and obligations." *Corbin v. Corbin,* 429 F. Supp. 276, 281 (M.D. Ga. 1977).

It is clear from the undisputed facts, however, that Kainz used his personal funds in purchasing the five lots. There was no utilization of corporate funds.

Lussier fails to cite any authority to support his theory that (1) when a corporate director or officer is indebted to the corporation for unpaid stock subscription which is due and payable, his personal funds will be deemed to be corporate funds and (2) if such funds are invested and a profit realized, such profit rightfully belongs to the corporation. We are not ready to equate a corporate director's or officer's personal funds with corporate funds whenever and to the extent that he owes the corporation any money.

The trial court properly granted summary judgment on Lussier's alleged claim based on the Maluna Kai and Maui Meadows lots.

## II. DIRECTED VERDICTS

Lussier asserts that the trial court erred in granting directed verdicts in favor of all of the defendants. He argues that his alleged claims, which were based on or involved (1) underpricing in the sale of Project units, (2) the Global units, (3) the

shareholders' suites,[7] (4) the preferential suites, (5) Lot 15 — the one-acre parcel, (6) Kainz's salary, and (7) punitive damages, should have been submitted to the jury for determination.

Generally, "on motions for a directed verdict, the evidence and the inferences which may be fairly drawn from the evidence must be considered in the light most favorable to the party against whom the motion is directed and if the evidence and the inferences viewed in that manner are of such character that reasonable persons in the exercise of fair and impartial judgment may reach different conclusions upon the crucial issue, then the motion should be denied and the issue should be submitted to the jury." *Young v. Price,* 47 Haw. 309, 313, 388 P.2d 203, 206 (1963), *reh'g,* 48 Haw. 22, 395 P.2d 365 (1964); *Collins v. Greenstein,* 61 Haw. 26, 595 P.2d 275 (1979); *McKenna v. Volkswagenwerk,* 57 Haw. 460, 558 P.2d 1018 (1977); *Switzer v. Drezen,* 2 Haw. App. 96, 626 P.2d 202 (1981); *Taira v. Oahu Sugar Company, Limited,* 1 Haw. App. 208, 616 P.2d 1026 (1980). Stating it another way, the granting of a directed verdict to the defendant is proper only when after "giving to the plaintiff's evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in plaintiff's favor, it can be said that there is no evidence to support a jury verdict in his favor." *Stewart v. Budget Rent-A-Car Corp.,* 52 Haw. 71, 77, 470 P.2d 240, 244 (1970); *Lang v. Beech Aircraft Corp.,* 4 Haw. App. 237, 663 P.2d 640 (1983); *Cafarella v. Char,* 1 Haw. App. 142, 615 P.2d 763 (1980).

We will apply the foregoing standard to each of Lussier's alleged claims *seriatim.*

### A. *Underpricing*

By agreement dated July 11, 1977, Mau-Van hired Blue Water Properties, Inc. (Blue Water) as its sales agent for the Project. The marketing of the Project units began in September 1977. However, realizing that real estate prices were rising, Kainz withheld the sale of 30 units. He intended to sell the 30 units later at higher prices after the Honfed construction

---

[7] In his briefs, Lussier uses the terms "units" and "suites" interchangeably and we likewise do so.

loan was closed.

The Honfed loan closed on April 21, 1978. In May 1978, Kainz released for marketing 23 of the 30 units,[8] together with other units for which the original buyers had either dropped out or were cancelled for failure to qualify for take-out loans. These units were marketed at prices higher than those set for units in September 1977.

Lussier contends that Kainz caused these units to be sold (1) prematurely and (2) at prices below their fair market values. He argues that by failing to withhold the sale of the units until January 1979, Kainz caused Maū-Van a loss of $1,652,500. Lussier charges Kainz with mismanagement in his capacity as a director and an officer of Mau-Van.

The determination of whether Kainz breached any duty as a director and an officer requires the use of legal yardsticks, both statutory and common law. Hawaii Revised Statutes (HRS) § 416-91.5 (Supp. 1982) provides in pertinent part:

> (c) A director shall perform his duties as a director, including his duties as a member of any committee of the board of directors upon which he may serve, in good faith and in a manner he reasonably believes to be in the best interests of the corporation, and with such care as an ordinarily prudent person in a like position would use in similar circumstances.

> *     *     *     *     *

> (e) A director shall not be considered to be acting in good faith if he has or should have knowledge concerning the matter in question that would cause such reliance described in subsection (c) to be unwarranted.

> (f) A person who performs his duties in compliance with this section shall have no liability by reason of being or having been a director of the corporation or a member of any committee of the board of directors of the corporation.

---

[8] Seven of the 30 units were sold to Global Construction Co., Inc. in December 1977. See Part II-B of the opinion, *infra.*

Hawaii Revised Statutes § 416-91.5 was enacted in 1979 as Act 67. 1979 Hawaii Sess. Laws 141-42. Subsections (c), (e), and (f) of HRS § 416-91.5 are almost the exact replicas of the pertinent parts of Section 35 of the Model Business Corporation Act, as revised in 1974.[9] The comment on revised Section 35 states:

> The standard provided in Section 35, as revised, sets forth the duty of care applicable to directors (including a director's right to rely on others), reflects the good faith concept embodied in the so-called "business judgment rule," which has been viewed by the courts as a fundamental precept for many decades . . . .
>
> By combining the requirement of good faith with the statement that a director must act "with such care as an ordinarily prudent person in a like position would use under similar circumstances," Section 35 incorporates the familiar concept that, these criteria being satisfied, a director should not be liable for an honest mistake of business judgment. A director attempting to create profits for his corporation will frequently make decisions involving risk for the enterprise. No personal liability should be imposed upon him in the event his good faith decision, in the exercise of business judgment, later seems to have been erroneous.

O. Sebring, *Report of Committee of Corporate Laws: Changes*

---

[9] Section 35 of the Model Business Corporation Act, as amended in 1974, provides in part:

> A director shall perform his duties as a director, including his duties as a member of any committee of the board upon which he may serve, in good faith, in a manner he reasonably believes to be in the best interests of the corporation, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. . . . [H]e shall not be considered to be acting in good faith if he has knowledge concerning the matter in question that would cause such reliance to be unwarranted. A person who so performs his duties shall have no liability by reason of being or having been a director of the corporation.

American Bar Association Committee on Corporate Laws, *Model Business Corporation Act* § 35, at 139-40 (1974).

The Model Business Corporation Act, as modified by the legislature, became a part of Hawaii's laws as Act 167, 1983 Hawaii Sess. Laws, on June 4, 1983. Its effective date is July 1, 1986.

*in the Model Business Corporation Act,* 30 Bus. Law. 501, 504 (1975). Thus, HRS § 416-91.5 (c) leads us to the common law "business judgment rule."[10]

The business judgment rule was developed "as a device for insulating corporate decision makers, both officers and directors, from personal liability for mistakes of business judgment arrived at in good faith." E. Johnson & R. Osborne, *The Role of the Business Judgment Rule in a Litigious Society,* 15 Val. U. L. Rev. 49, 52-53 (1980) (footnotes omitted). A traditional definition of the rule is:

> [O]rdinarily neither the directors nor the other officers of a corporation are liable for mere mistake or errors of judgment, either of law or fact. In other words, directors of a commercial corporation may take chances, the same kind of chances that a man would take in his own business. Because they are given this wide latitude, the law will not hold directors liable for honest errors, for mistakes of judgment, when they act without corrupt motive and in good faith, that is, for mistakes which may properly be classified under the head of honest mistakes.

3A Fletcher, *supra,* § 1039, at 37-38 (rev. perm. ed. 1975) (footnotes omitted). *See also,* C. Lewis, *The Business Judgment Rule and Corporate Directors' Liability for Mismanagement,* 22 Baylor L. Rev. 157 (1970); 19 Am. Jur. 2d *Corporations* § 1279 (1965).

Professor Dyson phrases the rule thusly:

> The director who diligently attends to his duties and exercises his best business judgment on the questions facing him will not be considered negligent even if his judgment is faulty. In other words, while the defendant should not be

---

[10] In enacting Hawaii Revised Statutes § 416-91.5 (1979), the legislature did not intend "to limit the application of common law to the actions or inaction of directors." Also, "[a]ctions taken against directors for breach of fiduciary duty, misfeasance or negligence under the provisions of [§ 416-91.5] are not intended to limit the complainant's right to join common law causes of action or to impose common law standards of care." House Stand. Comm. Rep. No. 478, 10th Hawaii Leg., Reg. Sess., *reprinted in* House Journal 1366 (1979). *See also* Senate Stand. Comm. Rep. No. 977, 10th Hawaii Leg., Reg. Sess., *reprinted in* Senate Journal 1453 (1979).

heard to argue that if he had been diligent his action *would have been* ineffective, the plaintiff should not be heard to allege that though the defendantwas diligent his action *was* ineffective.

R. Dyson, *The Director's Liability for Negligence,* 40 Ind. L. J. 341, 369 (1965) (emphasis in original).

Upon a careful review of treatises and pertinent case authorities, we hold that the business judgment rule requires a shareholder who challenges a nonself-dealing transaction[11] to prove that the corporate director or officer in authorizing the transaction (1) failed to act in good faith, (2) failed to act in a manner he reasonably believed to be in the best interest of the corporation, or (3) failed to exercise such care as an ordinarily prudent person in a like position would use in similar circumstances. *See* S. Arsht, *The Business Judgment Rule Revisited,* 8 Hofstra L. Rev. 93 (1979).

As to the issue of whether the business judgment rule shields Kainz from the charge that he prematurely marketed the units in May 1978, a directed verdict was proper.

The market condition for condominium apartments in Kihei was volatile. Ralph Grauman (Grauman), appraiser with John Child & Company, Inc. (John Child), testified that the market was "definitely flat" before the middle of 1976, with decreases in price in some instances; picked up from September to December 1976; was "active" in 1977; was as "active" in the first part of 1978 as it had been in 1977; was "active" in 1978; was "definitely flat" in 1979, although it may have been "active" January through March 1979; and was "flat" in 1980. Tr. at 1333-35. Real estate broker Michael Ray Van Diver (Van Diver), who was Blue Water's manager for the Project, testified that in 1974 or 1975 the market went down and "a lot of people got caught with a lot of high-priced real estate and couldn't unload it." Tr. at 626. Grauman testified that in May 1978 no one would have been able to predict what the real

---

[11] The "'business judgment rule' yields to the rule of undivided loyalty." 3A W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 1039, at 38 (rev. perm. ed. 1975). *See Maldonado v. Flynn,* 413 A.2d 1251 (Del. Ch. 1980). *Cf. Hawaiian International Finances, Inc. v. Pablo,* 53 Haw. 149, 488 P.2d 1172 (1971).

estate prices were going to be in June, September, or December 1978 or January 1979.

Bill Wilmore (Wilmore), president of Global Construction Company (Global), the general contractor for the Project, testfied that the development of a condominium project "can be extremely risky, depending on timing" and "higher and higher interest rates and inflation are situations that make you think very, very carefully before you get involved in one." Tr. at 675. He said that "a matter of luck as much as anything else" is a factor in the success of a project. Tr. at 693. Kainz's intention was to hold the 30 units until the closing of the Honfed construction loan, then put them on the market to "get the money." Tr. at 2660.

Based on the foregoing evidence, the only reasonable conclusion is that Kainz exercised his business judgment in releasing the units for sale in May 1978. His primary concern was to preclude the risk of Mau-Van being stuck with the units in a highly risky business with the interest rates going higher in a volatile market where market prices were unpredictable in the long run. To hold Kainz liable on a hindsight basis for mismanagement in not having withheld the units from the market until January 1979 would be a distortion of the business judgment rule. If Lussier's basis of liability is correct, Kainz would also have been liable if he had withheld the units from the market until late 1979 hoping for a larger profit for Mau-Van. The business judgment rule was developed to deliver a corporate director or officer from the "damned if you do and damned if you don't" dilemma.

The directed verdict for Kainz on the issue of whether he "prematurely" marketed the units was proper as a matter of law. We find nothing in the record to indicate that Kainz failed to act in good faith, in the best interest of Mau-Van, or as an ordinarily prudent person. By virtue of the directed verdict, "the result is saved from the mischance of speculation over legally unfounded claims." *Brady v. Southern Railway Co.,* 320 U.S. 476, 480, 64 S. Ct. 232, 234, 88 L.Ed. 239, 243 (1943).

As to whether Kainz caused the units to be sold at prices below the fair market value, the evidence viewed most favorably to Lussier shows the following facts. Appraisals for the

Project were obtained from John Child as of December 8, 1976, December 31, 1976, April 6, 1977, and August 25, 1977. The sale prices set for the units initially marketed in September 1977 were based on the August 25, 1977 appraisal. The last appraisal obtained from John Child was as of January 10, 1979. Before he left on a vacation in mid-March 1978, Kainz prepared a new price list for the units which were released for marketing in May 1978. These prices were higher than the values set forth in the August 25, 1977 appraisal.

Van Diver testified that in 1977 and 1978 the real estate prices in Kihei were "skyrocketing." Tr. at 606. Tom Street (Street), real estate broker for Blue Water, likewise testified that market values for condominium apartments in Kihei were "skyrocketing" in 1978. Tr. at 555. He also testified that when he saw the price list for the units released for marketing in May 1978, the prices were a "a little below market." Tr. at 567. Angelo Pelosi (Pelosi), real estate broker with First Kihei, testified that when he saw the price list in May 1978, he thought the prices were $10,000 to $15,000 "under the market" for one-bedroom units and should have been at "definitely higher" amounts for two-bedroom units. Tr. at 719. Mel Enevold, a broker with Kaiman Realty, testified that when he received the price list from Kainz, his reaction was that "it was low compared to . . . what I felt the market would carry" (Tr. at 495), "probably $10,000 or $15,000" below the market for one-bedroom units. Tr. at 496.

Kainz knew that the values set forth in the August 25, 1977 appraisal were "too low" by March 1978. Tr. at 2656. Yet, Kainz did not obtain a current appraisal for the units and did not consult with the selling agent for the Project unit.[12]

Based on the foregoing evidence, the jury could have reasonably found that Kainz failed to exercise such care as an ordinarily prudent person would in pricing the units released

---

[12] Kainz testified that he talked to Tom Street about the prices and was told by him "Hold it, that's a little bit too much, little bit too high." Transcript of January 5 - February 4, 1981 Proceedings (Tr.) at 2653. However, Tom Street's testimony was that he did not recall any discussion with Kainz about prices for the units. Viewing the evidence most favorably to Lussier, we are compelled to disregard Kainz's testimony on this factual issue.

for marketing in May 1978 below their fair market values. Consequently, the trial court erred in directing a verdict in Kainz's favor on this issue.

## B. *The Global Units*

In order to obtain the building permit for the Project, approval of the application by the Department of Water Supply was necessary. Such approval could not be obtained until Mau-Van submitted a surety bond or cashier's check to the department to assure the payment of a storage assessment fee of $62,100 as required by an agreement dated December 2, 1977. Mau-Van had no cash to make such payment. An air of urgency hovered over the matter of the building permit since the Department of Water Supply had made a finding of a water shortage in the Kihei area and a water moratorium was anticipated. A moratorium would delay the issuance of a building permit.

Kainz telephoned the Seaboard Surety Company (Seaboard) and learned that no bond would be issued without cash. Kainz asked Global, the Project's general contractor, for a loan. Wilmore, president of Global, testified that "we don't have money to loan anybody." Tr. at 647. Global refused Kainz's offer to put up a condominium unit as security for a loan of $62,000. Kainz offered a unit free and clear for $62,100 which Wilmore refused. Wilmore testified:

> Well, if I were to do that, why shouldn't I just take the $60,000 and go down to the realtor and buy six units, because I've got that option, right? I can take the money and make my downpayments like any other investor. Why should I buy it cash. [Tr. at 655-56.]

Kainz agreed with Wilmore to release seven of the 30 withheld units for sale to Global with $62,100 credited toward their down payments in consideration of a $62,100 surety bond Global would obtain from Seaboard. Seaboard issued the bond on January 11, 1978. Subsequently, on February 16, 1978, Kainz obtained an agreement from Blue Water to waive its sales commissions for the seven units sold to Global.

The Honfed loan commitment required a presale of 70% of the Project units to purchasers approved by Honfed before

January 31, 1978.[13] Global was among the first purchasers to be approved by Honfed as mortgagors.

A reasonable person viewing the foregoing evidence and the fair inferences to be drawn therefrom in the light most favorable to Lussier cannot but conclude that Kainz acted in good faith, acted in a manner he reasonably believed to be in the best interest of Mau-Van, and exercised such care as an ordinarily prudent person in a like position would use in similar circumstances concerning the transaction discussed. The trial court did not err in directing a verdict in Kainz's favor on the Global units claim.

### C. *The Shareholders' Suites*

The following evidence is not in dispute. Each of the 18 original Mau-Van shareholders was granted the privilege of purchasing a Project unit of his choice at the original September 1977 sales price less a discount equal to the 6% sales commission payable by Mau-Van to Blue Water. Only nine shareholders took advantage of this privilege and reserved specific Project units. Three of these units are in dispute.

Shareholder Domenico Germani could not qualify for a Honfed mortgage for Suite D-405, the purchase price for which was $62,500. In February 1979, Germani "relinquished" his interest in Suite D-405 to Kainz in consideration of Kainz's agreement to personally pay him $20,000. Subsequently, Kainz personally purchased Suite D-405 from Mau-Van and, in turn, sold it to John Widmar for $115,000.

Shareholder Koenig was financially unable to complete the purchase of Suite C-201 for the price of $58,000. In July 1978, Koenig "relinquished" her interest in the suite to Kainz for $15,000. Kainz purchased Suite C-201 from Mau-Van and was the owner of it at the time of trial.

Shareholder Edgar Kainz reserved Suite C-407 which had a purchase price of $62,000. Edgar was a student and could not personally pay for Suite C-407. Kainz purchased the suite and obtained title in his name. Kainz testified that he had purchased Suite C-407 in trust for his son Edgar.

Lussier alleges that (1) Kainz's actions involving Suites D-405, C-201, and C-407 were in contravention of corporate

---

[13] The 70% presale requirement was waived by Honfed in April 1978.

policies; (2) Kainz, as a director and an officer of Mau-Van, breached his fiduciary duties by engaging in self-dealing and garnering secret profits and gains; and (3) consequently, Kainz, as well as Germani and Koenig, must disgorge whatever profits and gains they derived from the challenged transactions.

A corporate director or officer "occup[ies] a fiduciary capacity." 3 Fletcher, *supra,* § 850, at 175. *See Hawaiian International Finances, Inc. v. Pablo,* 53 Haw. 149, 488 P.2d 1172 (1971); *Lum v. Kwong,* 39 Haw. 532 (1952). As a fiduciary, his duties to the corporation "include undivided, unselfish and unqualified loyalty, unceasing effort never to profit personally at corporate expense, and unbending disavowal of any opportunity which would permit the director's private interests to clash with those of his corporation." W. Knepper, *Liability of Corporate Officers and Directors* (hereinafter "Knepper") § 1.04, at 8 (3d ed. 1978). He "will not be permitted to make a private or secret profit" out of his official position. 19 Am. Jur. 2d *Corporations* § 1281, at 687 (1965). *See Hawaiian International Finances, Inc. v. Pablo, supra.*

Exhibit S-176 is the minutes of Mau-Van directors' meeting held on September 15, 1978. Directors Kainz, Hensel, Honigman, and Schlamann were present at the meeting, while Lussier was absent. The minutes state, *inter alia:*

2. On motion made by R. Hensel and seconded by C. Schlamann it was resolved that: only one "shareholder suite" be allotted to any one shareholder. A shareholder suite is defined to mean a suite which does not attract real estate commission. Messers. [sic] Kainz and Giegerl are shareholders who currently hold more than one shareholder suite and accordingly they shall reimburse another shareholder for the commission otherwise payable on his suite. The "extra" shareholder suites shall be offered to the current shareholders and if there are insufficient suites to satisfy the number of requests then the suites shall be allotted on the basis of a draw. An exception to the draw may be made in the case of any shareholder who previously gave up a shareholder suite and in which case that shareholder may appeal to the shareholders at large for a right of first refusal on the vacant shareholder suite. The decision of

the shareholders shall be final with respect to granting priority on the vacant suite.

CARRIED UNANIMOUSLY

\* \* \* \* \*

7. It was agreed that no shareholder would be entitled to acquire more than one suite.[14] [Footnote added.]

It is not entirely clear what item 2 really means. However, reading items 2 and 7 together seems to indicate that a shareholder should not get more than one shareholder suite. There is nothing in the record to indicate that the directors' actions taken on September 15, 1978 were ever modified, rescinded, or repealed.

Based on the evidence in the record the jury could have reasonably concluded that (1) Kainz knowingly contravened corporate policy by acquiring two additional shareholders' suites, Nos. D-405 and C-201; (2) if Kainz's testimony concerning the trust for Edgar was deemed not credible by the jury, he also acquired Suite C-407 in contravention of corporate policy; and (3) by such self-dealings, Kainz reaped secret profits and gains from the transactions. Consequently, the trial court erred in directing verdicts in favor of Kainz, Germani, and Koenig on the claims involving the shareholders' suites.

### D. *The Preferential Suites*

Lussier's "preferential suites" claim is based on the fact that Blue Water maintained a "backup" list of potential purchasers of Project units. Should any cancellations occur, Blue Water would refer to the backup list for substitute purchasers on a chronological basis. A purchaser on the backup list had no reservation for any specific unit. Lussier charges that Kainz breached a fiduciary duty owed Mau-Van by selling units to himself and others, ahead of those on the backup list.

It is clear from the evidence that Blue Water kept the backup list for its own convenience and for the maintenance of

---

[14] We construe this to mean *one shareholder suite* since shareholders could purchase Project units being sold on the open market by Blue Water, Mau-Van's sales agent.

fair play and good relations with its clients. Both Street and Van Diver testified that the backup list was not binding on the developer who could sell to whomever it pleased. Thus, the "bumping" of those on the backup list in itself was not a breach of any fiduciary duty on the part of Kainz. The determinative question is whether the sale prices of the preferential suites were fair to Mau-Van.

### 1. *Suites A-101 and B-208*

Suite A-101 was originally sold to Mr. and Mrs. Lester Holmes for $77,500. For failure to make the 20% down payment, Kainz cancelled the Holmes' contract on May 11, 1978. On December 15, 1978, Kainz signed a contract with Mau-Van to purchase Suite A-101 for $99,540. The January 10, 1979 appraisal listed the value of Suite A-101 as $147,000. On March 24, 1979, Kainz sold Suite A-101 for $155,000.

Gordon Hafft originally purchased Suite B-208 for $76,500. Hafft's contract was cancelled effective May 18, 1978 since he failed to qualify for a Honfed mortgage loan. On July 1, 1978, Kainz signed a sales contract to purchase Suite B-208 for $76,500. At the time of trial, Kainz remained the owner of Suite B-208.

Here, we are dealing with transactions which the law does not favor. A corporate director or officer should not place himself in a position where his individual interest clashes with that of his corporation. 19 Am. Jur. 2d *Corporations* § 1288 (1965). It is true that a director or officer is not absolutely precluded from dealing or entering into a contract with his corporation. However, such contract will be subject to close scrutiny and is valid only if the director or officer has acted in good faith and there is no fraud or unfairness in the transaction. *Id.* § 1291.

Applying the foregoing precepts, the jury could have reasonably concluded from the evidence that the purchase prices Kainz paid for Suites A-101 and B-208 were not fair to Mau-Van. Inasmuch as Kainz sold Suite A-101 for $155,000 three months after its purchase, it would not be unreasonable for a jury to conclude that the purchase price of $99,540 was low and unfair to Mau-Van.

Concerning Suite B-208, Kainz argues that the price of

$76,500 (the same September 1977 price offered to the original cancelled purchaser Hafft) was fair because Hafft had filed a suit against Mau-Van to contest the cancellation and while litigation was pending, the suite could not be sold to anyone. This reasoning is suspect since Kainz signed his contract to purchase on July 1, 1978, while Mau-Van's final cancellation notice letter is dated July 26, 1978.

We hold that the trial court's direction of verdict on the issues involving Suites A-101 and B-208 was improper.

### 2. Suite B-302

Robert Wagner originally purchased Suite B-302 for $61,500. His contract was cancelled on May 22, 1978 for failure to apply for a mortgage loan. On July 17, 1978, Kainz had Suite B-302 sold for $76,450 to Mr. and Mrs. Glenn Austin (Austins), who were not on Blue Water's backup list. On January 27, 1979, the Austins sold Suite B-302 to a third party for $94,000.

The foregoing facts do not support the imposition of liability on Kainz. As discussed above, Blue Water's backup list was not binding on Mau-Van or Kainz. The price of Suite B-302 sold to the Austins was fair. Van Diver testified that the Austins paid the same price as anyone on Blue Water's backup list would have paid. Kainz did not personally profit in the sale of Suite B-302 to the Austins or in its resale by them.

### 3. Suite D-204

Suite D-204 was originally sold to Joe and Colleen Sciarra on December 23, 1977 for $57,500. Subsequently, the Sciarras' contract was cancelled.

In May 1978, Mau-Van owed the law firm of Ueoka & Luna approximately $23,000 for legal services and costs. Mau-Van then did not have cash available for the payment of this debt. Knowing that B. Martin Luna (Luna) of the law firm was interested in purchasing a Project unit, Kainz negotiated an agreement with Luna, whereby Ueoka & Luna would allow Mau-Van to defer payment of the debt until the completion of the Project and Mau-Van would sell Suite D-204 to Luna and his wife for $57,500 without the need to make any payment until escrow closing. The Lunas signed a sales contract for Suite D-204. Subsequently, Suite D-204 was conveyed to the Lunas and at the time of trial, the Lunas were the owners of the

suite. Kainz negotiated with Blue Water for a reduction of the sales commission from 6% to 3%.

Based on the evidence, we hold that the business judgment rule shields Kainz from liability in the Suite D-204 transaction. A reasonable person viewing the evidence and the fair inference therefrom in the light most favorable to Lussier would conclude that Kainz acted in good faith, acted in a manner he reasonably believed to be in the best interest of Mau-Van, and exercised such care as an ordinarily prudent person in a like position would exercise in similar circumstances.

The trial court properly directed verdict in favor of Kainz on the Suite D-204 claim.

### E. *Lot 15 — The One-Acre Parcel*

Lot 15, the one-acre parcel, abutted Lot 16, the parcel on which the Project was developed. Although Mau-Van intended to develop Lot 15 as a commercial complex after the completion of the Project, it lacked the financial resources to proceed with the development itself.

In December 1978, Mau-Van shareholders Honigman, Kainz, and Max Sovdat formed Hokaso Enterprises, Inc. (Hokaso), a Hawaii corporation. Subsequently, Lussier also became a shareholder of Hokaso. At Mau-Van's shareholders' meeting held on March 18, 1979, Kainz reported that Hokaso was "prepared to finance Phase II [Lot 15] — complete the construction, enter into the master lease of the whole building and be responsible for all operational and maintenance problems." Exhibit S-204. The shareholders accepted Hokaso's proposal in principle and specified that only disinterested directors would represent Mau-Van in any transaction involving Hokaso. Subsequently, on June 1, 1979, disinterested directors Hensel and Schlamann rejected the proposed master lease and no deal with Hokaso was concluded.

On October 3, 1979, Mau-Van listed Lot 15 for sale with First Kihei at the price of $1,500,000. On October 12, 1979, Charles Taylor III (Taylor) submitted an offer to purchase Lot 15 for $750,000 which was later rejected. On November 14, 1979, Taylor made a second offer for the price of $1,000,000. This offer was disclosed to the shareholders at a shareholders' meeting held on November 19, 1979. The shareholders unani-

mously voted to sell Lot 15. The shareholders further voted that there should be "an extension of time·or a counteroffer" and that Kainz should negotiate further. Tr. at 1807. Any decision made was to be ratified by the board of directors.

There being no response to the November 14th offer, on December 14, 1979, Taylor submitted another offer for $1,000,000 but with an increased down payment. On December 18, 1979, Mau-Van made a counteroffer increasing the price to $1,100,000 and including certain special conditions. On December 19, 1979, Taylor countered Mau-Van's counteroffer. On December 21, 1979, Taylor made his last offer which essentially was the same counter-counteroffer on a new DROA. The DROA required a response from Mau-Van by 6:00 p.m. of the same day. The DROA expired for want of acceptance by Mau-Van.

By letter dated February 14, 1980, Stephen Charles Forde (Forde) offered to purchase Lot 15 for $1,085,000 which was later rejected by Kainz. Forde's March 1980 offer for $900,000 and a June 23, 1980 offer for $652,000 were likewise rejected by Kainz. Pelosi, broker for First Kihei, testified that the market for commercial property was "going down" at this time. Tr. at 764.

### 1. *Hokaso*

Concerning Hokaso, the evidence and fair inferences therefrom fail to form any basis for liability on the part of Kainz. There was full disclosure made by Kainz to the shareholders of his interest in Hokaso and what Hokaso's general proposal was for Lot 15. Disinterested directors Hensel and Schlamann negotiated with Hokaso and rejected the proposed master lease. Kainz did not even attempt to speak for Mau-Van in a proposed transaction with Hokaso in which he had a conflicting interest.

A directed verdict in favor of Kainz on the Hokaso matter was not erroneous.

### 2. *Taylor and Forde Offers*

Kainz argues that he exercised his sound judgment in not inviting further offers from Taylor since Taylor's existence and the authenticity of his offers were suspect. He also claims that based on the evidence "the jury could not have reasonably found that 'Forde' was a ready, willing and able buyer."

On the other hand, Lussier contends that in rejecting Taylor's and Forde's offers, Kainz was moved by self-interest and did not act in the best interest of Mau-Van. The testimony of Pelosi supports Lussier's contention.

A   [By Pelosi] He [Kainz] repeated to me he would be interested in it [Lot 15] for $650,000, and that he had gotten an okay from the majority of the shareholders to get it for $750,000.

\* \* \* \* \*

Q   [By Lussier's counsel] And do you recall when this was?

A   That was periodically, I would say, throughout the end of '79 and first few months of — first three, four months of '80. It was a periodic thing. It's hard to put a date on it.

\* \* \* \* \*

A   What I said was that periodically Mr. Kainz mentioned that he would be willing to buy it at that price [$650,000].

Q   Buy at that price?

A   Yes, himself, for him and his group.

\* \* \* \* \*

A   I think both Mr. Kainz and Mr. Lussier have placed many roadblocks in the sale of this property.

Q   Well, let's focus for a second of [sic] any roadblocks placed by Mr. Kainz. What are they, in your opinion?

A   I believe that during the time of the offers from Mr. Ford [sic] — not Mr. Ford [sic], Mr. Taylor — Bill Kainz was interested in purchasing the property himself, and therefore kind of stalled on trying to get something negotiated. In the case of Mr. Ford [sic], I think it's Mr. Lussier who ruined it.

Q   What do you base that on?

A   Communication between Mr. Ford [sic] and Mr. Lussier. Mr. Ford [sic] became aware of all the internal problems of Mau-Van, and I think that's one of the reasons

his offering price kept going down, besides the market value. [Tr. at 767-74.]

If the jury found Pelosi's testimony credible, the jury could have also found Kainz liable on Lussier's claim based on the Taylor and Forde offers.[15] Thus, the trial court erred in directing verdicts in Kainz's favor on these issues.

## F. *Kainz's Salary*

On January 28, 1980, the directors of Mau-Van were Honigman, Kainz, Lussier, and Schlamann. At a board of directors' meeting held on that date, Honigman moved to hire Kainz as a general manager for a salary of $1,950 plus a car and gas allowance of $50 per month, effective January 1, 1980. Schlamann seconded the motion. The motion was approved with the votes of Honigman and Schlamann in favor, Lussier against, and Kainz abstaining.

Lussier concedes that under HRS § 416-26(12) (1976) and article IV of Mau-Van's by-laws, the directors have authority to appoint corporate officers, agents, and employees and to fix their salary and compensation. However, he claims that because both Honigman and Schlamann were "dominated" by Kainz, their votes did not count and the board's action was ineffective.

Viewing the evidence and the fair inferences therefrom in the light most favorable to Lussier, we conclude that a reasonable person could not have found that Honigman was a dominated director. The evidence indicates that although Honigman trusted Kainz, especially with respect to investments, he made his decisions independently as a director.

---

[15] Lot 15 was finally sold to Gregory A. Kirst (Kirst) for $850,000 on September 18, 1980. The sale was subject to a specified condition that if the seller "is unable to remove existing lease to First Kihei Realty by December 1, 1980, [Kirst] has option to cancel this offer[.]" Exhibit S-329. At the time of trial, the record indicates that a lawsuit was pending between Mau-Van and First Kihei. Therefore, Lussier's claim based on Kainz and Schlamann allegedly having wrongfully given First Kihei a lease and option to lease on October 1, 1979 was severed from the trial.

Inasmuch as the trial court severed the claim based on the lease and option to First Kihei which affected Lot 15 and the sale thereof to Kirst, the court should have also severed from the trial the claims based on Taylor's and Forde's offers. If the alleged claims had been submitted to the jury and it found in favor of Mau-Van, it would not have been able to determine the damages without knowing whether the sale of Lot 15 to Kirst was valid or not.

However, we conclude otherwise as to Schlamann. We find that a reasonable person could have concluded that Schlamann was a dominated director. Walter Walcher, a shareholder, testified:

Q  [By plaintiff's counsel] Who came to you and asked you to sign the affidavit?
A  [By Walcher] Curt Schlamann.

\*  \*  \*  \*  \*

Q  And what did he tell you when he talked to you about the affidavit?
A  I am just a messenger. I just take orders.
Q  Is this what he —
A  From Mr. Kainz.
Q  This is what Mr. Schlamann said to you?
A  Yes.
Q  And what else?
A  And I don't make any decisions, he said.

Tr. at 2383-84.

Lussier's theory of recovery on this claim is grounded on "self-dealing" on the part of Kainz. In substance, he argues that (1) director Schlamann was dominated by Kainz, (2) Schlamann did not exercise his independent judgment, and (3) Kainz, in essence, voted through Schlamann on the motion hiring himself as Mau-Van's general manager at a salary and allowances totaling $2,000 per month.

It is clear that absent any authorization by statute, articles of incorporation, or corporate by-laws, a director may not vote to approve a salary for his services as a corporate employee. 19 Am. Jur. 2d *Corporations* § 1407 (1965); 5 Fletcher, *supra,* § 2129 (rev. perm. ed. 1976). *Cf. Hawaiian International Finances, Inc. v. Pablo, supra.* Although the authorities are divided, we hold that where a director votes to approve his own salary, the board's action is not void but voidable by the corporation if the salary is unreasonable or fraud is involved. *O'Malley v. Casey,* 42 Colo. App. 85, 589 P.2d 1388 (1979); 5 Fletcher, *supra,* § 2129. The burden is on the director-officer to show the reasonableness of such salary. *In re Trust Estate of Farrington,* 42 Haw. 543 (1958); *Bolte v. Bellina,* 15 Haw. 151 (1903); *Binz*

*v. St. Louis Hide and Tallow Company,* 378 S.W.2d 228 (Mo. App. 1964); Knepper, *supra,* § 6.06. *See also,* Note, *Executive Compensation in Close Corporations: The Need for a Modified Judicial Approach to the Reasonableness Test,* 1972 Duke L. J. 1251. Furthermore, despite the fact that the board action is unenforceable by reason of his participation, the director-officer may recover or retain the salary, if it represents the reasonable value of his services on a quantum meruit basis. 5 Fletcher, *supra,* § 2129; *Gauger v. Hintz,* 262 Wis. 333, 55 N.W.2d 426 (1952); *Kenton v. Wood,* 56 Ariz. 325, 107 P.2d 380 (1940).

We hold that the trial court properly directed verdict in Honigman's favor but erroneously granted Kainz's and Schlamann's motions for directed verdict.

Moreover, the state of the evidence in the record was insufficient for a reasonable person to conclude that the services Kainz actually rendered as general manager were worth $1,950 per month on a quantum meruit basis.

Thus, upon remand and retrial, the jury should determine whether Schlamann was or was not dominated by Kainz. If he was, Kainz has the burden of proving that the salary was reasonable or that he was entitled to the salary on a quantum meruit basis. If Schlamann was not dominated by Kainz, Lussier has the burden of proving that the salary was unreasonable.

### G. *Punitive Damages*

In paragraph 13 of the amended complaint, Lussier alleged that Kainz "acted maliciously, oppressively, in a grossly negligent manner, and with wanton disregard for the consequences of his acts on Mau-Van and its shareholders." Based on such allegation, he sought "punitive damages in such amounts as shall be proved at trial." He argues that the trial court erred in directing a verdict for Kainz on this claim.

The shareholder's right to maintain a derivative action on behalf of the corporation is equitable in nature. 19 Am. Jur. 2d *Corporations* §§ 528, 532 (1965). As in equitable actions generally, 22 Am. Jur. 2d *Damages* § 239 (1965); Annot., 48 A.L.R. 2d 947 (1956), the traditional view is that punitive damages are not awarded in derivative actions. *See Beals v. Washington International, Inc.,* 386 A.2d 1156 (Del. Ch. 1978).

However, the Supreme Court of Iowa has observed that the "modern trend is for an equity court to award such [punitive] damages especially where the same court administers legal and equitable relief," *Charles v. Epperson & Co.,* 258 Iowa 409, 431, 137 N.W.2d 605, 618 (1965), and held that "in a stockholder's derivative action an equity court may, in its discretion, award exemplary damages upon a showing that some legally protected right has been invaded, such as an intentional act of fraud or other wrongful conduct." *Holden v. Construction Machinery Co.,* 202 N.W.2d 348, 359 (Iowa 1972). The court has stressed that punitive damages in derivative actions "are not allowed as a matter of right" but "are always discretionary." *Rowen v. Le Mars Mutual Insurance Co. of Iowa,* 282 N.W.2d 639, 661 (Iowa 1979).

In Hawaii, we have a dearth of reported cases involving shareholders' derivative actions. We know of no reported Hawaii case where punitive damage was sought in a derivative action. Thus, this is a case of first impression.

Inasmuch as we have one form of action in this jurisdiction, whether cognizable as cases at law or in equity, Rules 1 & 2, HRCP (1981), we hold that in shareholders' derivative actions, punitive damages are awardable within the discretion of the court, *Kang v. Harrington,* 59 Haw. 652, 587 P.2d 285 (1978), where the acts complained of are "done willfully, wantonly or maliciously or is characterized by some aggravating circumstances." *Howell v. Associated Hotels, Ltd.,* 40 Haw. 492, 495-96 (1954).

We have reviewed the record and find no evidence supporting Lussier's allegation that Kainz "acted maliciously, oppressively, in a grossly negligent manner, and with wanton disregard for the consequences of his acts on Mau-Van and its shareholders." The trial court properly directed verdict for Kainz on Lussier's claim for punitive damages.

### H. *Defendant Helfrich*

The amended complaint named Helfrich as a defendant but failed to allege any wrongful act or omission against him. Lussier's opening brief is devoid of any argument why the trial court's granting of directed verdict in Helfrich's favor was erroneous. Helfrich argues in his answering brief that Lussier

has waived and abandoned the appeal as to him. We agree.

In his reply brief, Lussier claims that the opening brief made specific mention of Helfrich's "role in the 'rollback' of Kainz' ouster by the shareholders [O.B. 49, n.229, citing S-245, S-254]." Footnote 229 in Lussier's opening brief pertains to his argument that the trial court erred in failing to disqualify the law firm of Ueoka & Luna and not to any liability on the part of Helfrich. Furthermore, the amended complaint contains no alleged claim for damages or relief on account of the "rollback" of Kainz's ouster by the shareholders.

We hold that the trial court's directed verdict in favor of Helfrich was proper.

### III. MOTION IN LIMINE

On January 5, 1981, the day the trial of the case commenced, Lussier filed his motion in limine to exclude evidence of his alleged motives in bringing the derivative action. On the same day, the trial court orally denied Lussier's motion and the written order was filed on February 2, 1981.

Lussier contends that the trial court's denial of the motion was reversible error. He argues that if a case is made out on the facts, his motives in bringing the suit were immaterial. *See Carter v. Wing Chong Wai Co.,* 12 Haw. 291 (1899); *Somers v. AAA Temporary Services, Inc.,* 5 Ill. App. 3d 931, 284 N.E.2d 462 (1972); 1 Am. Jur. 2d *Actions* § 55 (1962). He claims that where a plaintiff seeks relief for the benefit of all shareholders, motives are immaterial. *Mardel Securities, Inc. v. Alexandria Gazette Corp.,* 320 F.2d 890 (4th Cir. 1963); 3B J. Moore & J. Kennedy, *Moore's Federal Practice* ¶ 23.1.17 (1982); 7A C. Wright & A. Miller, Federal Practice and Procedure: *Civil* § 1834 (1972).

The granting or denying of a motion in limine is within the trial court's inherent power to exclude or admit evidence. Note, *Pretrial Exclusionary Evidence Rulings,* 1967 Wis. L. Rev. 738. Absent an abuse of discretion, its determination will not be disturbed on review. *Exchange Nat. Bank of Chicago v. DeGraff,* 110 Ill. App. 3d 145, 441 N.E.2d 1197 (1982); *Crothers v. LaSalle Institute,* 40 Ill. App. 3d 984, 353 N.E.2d 114 (1976).

In essence, a motion in limine is generally made before or at the beginning of a jury trial for a protective order against prejudicial questions, statements, and evidence. It serves the useful purpose of raising and pointing out before trial certain evidentiary rulings the court may be called upon to make during the course of trial. *Twyford v. Weber,* 220 N.W.2d 919 (Iowa 1974); *See also Akins v. State,* ___ Ind. ___, 429 N.E.2d 232 (1981); *Lagenour v. State,* 268 Ind. 441, 376 N.E.2d 475 (1978); T. Davis, *Motions in Limine,* 15 Clev.-Mar. L. Rev. (2) 255 (1966).

The denial of a motion in limine, in itself, is not reversible error. The harm, if any, occurs when the evidence is improperly admitted at trial. *Akins v. State, supra; Dayton Walther Corp. v. Caldwell,* 180 Ind. App. 539, 389 N.E.2d 723 (1979); *State v. Church of Nazarene of Logansport,* 268 Ind. 523, 377 N.E.2d 607 (1978). The complaint on appeal then must be based on the trial record. *Twyford v. Weber, supra.* Thus, even if the trial court abused its discretion in denying Lussier's motion, the real test is not in the disposition of the motion but in the admission of evidence at trial.

Where the motion in limine is denied and during trial, opposing counsel attempts to ask the questions challenged in the motion or offer the prejudicial evidence covered therein, a proper objection at that time is necessary to preserve the error for appellate review. *United States v. Traylor,* 656 F.2d 1326, 1333, n.6 (9th Cir. 1981); *Collins v. Wayne Corporation,* 621 F.2d 777 (5th Cir. 1980); *Lagenour v. State, supra; State v. Church of Nazarene of Logansport, supra; Twyford v. Weber, supra; Hartford Accident & Indemnity Co. v. McCardell,* 369 S.W.2d 331 (Tex. 1963); Note, *Pretrial Exclusionary Evidence Rulings,* 1967 Wis. L. Rev. 738. Having no legitimate reason for not objecting, the objection is deemed to have been waived. *See Rojas v. Richardson,* 703 F.2d 186 (5th Cir. 1983).

An exception to this general rule is that objections need not be renewed if the prior ruling on the motion in limine amounted to an unequivocal holding concerning the issue raised. *State v. Miller,* 229 N.W.2d 762 (Iowa 1975). Where a hearing was held, counsel presented legal arguments, and the trial court ruled whether or not the challenged evidence would

be admitted at trial, there is no necessity of further objection to preserve such error for appeal. *State v. Harlow,* 325 N.W.2d 90 (Iowa 1982).

In the instant case, the trial court simply ruled that the motion was denied as to evidence of plaintiff's motives in bringing the suit. The trial court not having ruled on the admissibility of the evidence beforehand, a proper objection was necessary at trial to preserve this error for appellate review.

On appeal, it was incumbent upon Lussier, at the least, to set forth in his brief the transcript pages where the allegedly prejudicial material was admitted during trial and the proper objections made by him. *See Akins v. State, supra.* Lussier failed to meet this requirement and we will not comb through fifteen volumes of transcript for such material and objections, if made at all by Lussier. In fact, the transcript reveals an instance of Lussier's failure to object to the following testimony:

Q    [By Kainz's counsel] What did Mr. — what discussion did you have with Mr. Lussier?

A    [By Schlamann] When we talked, Mr. Lussier told me all the stories, what was wrong in First Kihei Real Estate, and I said[,] "I don't want to hear your stories from First Kihei Real Estate. Mau-Van has nothing to do with that." And he said, "I'm going to get Bill [Kainz]. I'll sue him."

And I said, "If you want to sue Bill, you wait 'til Mau-Van is finished." Then we just started building at that time. "And you sue him after." That's what I told him.

Tr. at 2268. Furthermore, Lussier never testified, so no questionable testimony was offered or introduced through him.

In his opening brief, Lussier does refer to certain objectionable remarks concerning his motives made by Kainz's counsel in his opening statement. However, Lussier's counsel did not object to those remarks. Ordinarily a prevailing party's opening statement is not a ground for reversal unless the adversary's substantive rights have been prejudiced. *Smith v. Gizzi,* 564 P.2d 1009 (Okla. 1977); *Miller v. Hickman,* 359 P.2d 172 (Okla. 1961). *See, also Cantrell v. Superior Loan Corp.,* 603 S.W.2d 627 (Mo. App. 1980); *Schwedler v. Galvan,* 46 Ill. App. 3d 630, 360 N.E.2d 1324 (1977). The question of whether an

improper opening statement substantially influenced the verdict or denied the defendant a fair trial lies within the discretion of the trial court. *Smith v. Gizzi, supra; Beavers v. Boykin,* 273 Ala. 413, 142 So.2d 10 (1962).

In the instant case, Lussier has not indicated how the statements biased the trial court or influenced the direction of the verdict. The trial judge knew that opening statements were not part of the evidence. *See Smith v. Gizzi, supra.*

Lussier's contention is without merit.

### IV. DISQUALIFICATION OF UEOKA & LUNA

On August 29, 1979, Lussier filed a motion for a temporary restraining order and a motion for preliminary injunction. In those motions, Lussier also sought to prohibit "Martin Luna or his firm or lawyers connected therewith from acting on behalf of Mau-Van." By order filed on October 4, 1979, Lussier's "Motion for Disqualification of Counsel" was "denied without prejudice." On August 18, 1980, Lussier filed his "Motion for Order Disqualifying The Firm of Ueoka & Luna." The motion was denied on September 18, 1980. Lussier claims that the denial of the motion was reversible error.

### A. *Appellate Review*

We first address Mau- Van's waiver argument. In his notice of appeal filed on April 6, 1981, Lussier "appeals from the judgment filed and entered on February 13, 1981, and all portions thereof, and from the order filed January 23, 1981, granting in part, and denying in part, the renewed motion for summary judgment of defendant Wilhelm Kainz, and from the order filed March 9, 1981, denying plaintiff's motion for new trial and to vacate partial summary judgment." Mau-Van claims that because Lussier failed to specify the orders filed on October 4, 1979 and September 18, 1980, respectively, he waived his right to appeal the disqualification issue. We disagree.

It is well-settled that an appeal from a final judgment brings up for appellate review all interlocutory orders dealing with issues in the case not appealable directly as of right. *Pioneer Mill Co. v. Ward,* 34 Haw. 686 (1938). *See also City & County*

*v. Midkiff,* 57 Haw. 273, 554 P.2d 233 (1976).

## B. *Conflict of Interest*

In seeking to disqualify Ueoka & Luna, Lussier argued to the trial court that: (1) Luna had a conflict of interest which prevented him and his law firm, Ueoka & Luna, from giving Mau-Van independent advice and (2) Luna would be a witness in the case.

In support of the conflict of interest ground, Lussier contended below that (1) Luna was a creditor of defendant Kainz; (2) as a creditor, he had an economic stake in supporting a judgment favorable to Kainz; (3) such personal interest was adverse to the interest of defendant Mau-Van; and (4) as a result, Mau-Van was not and could not be given independent advice on the merits of Lussier's derivative claims by Luna and his law firm. Disciplinary Rules (DR) 5-101(A), Code of Professional Responsibility (1981).[16] However, the affidavit of Luna attached to the memorandum in opposition to Lussier's motion filed on September 5, 1980 clearly shows that Luna was not a creditor of Kainz, but a creditor of Trans-Am Development, a limited partnership, in which Kainz had a one percent interest. Although not indicated in its terse order denying Lussier's motion, the trial court may not have found a conflict under those circumstances.

There was also no joint representation by Ueoka & Luna of both Mau-Van and Kainz, defendants with adverse interests.[17]

---

[16] Rule 16.2, Rules of the Supreme Court of the State of Hawaii (1981), states that the Code of Professional Responsibility (Code) which is attached to the Rules "shall govern the conduct of all attorneys subject to discipline under this rule."

DR 5-101(A) of the Code provides:

> Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests.

[17] In his amended opening brief, Lussier alludes to the fact that "Ueoka & Luna defended not only Mau-Van but also all other individual defendants except Kainz." He then states that "the courts generally find dual representation impermissible as it is in the corporation's interest to discern the truth." Plaintiff-Appellant's Amended Opening Brief at 49, n.231.

However, this argument was not presented to the trial court and is raised for the first time on appeal. Thus, we will not consider this matter. *State v. Robinson,* 50 Haw. 501, 443 P.2d 140 (1968); *Kawamoto v. Yasutake,* 49 Haw. 42, 410 P.2d 976 (1966); *In re Keamo,* 3 Haw. App. 360, 650 P.2d 1365 (1982).

*See, e.g., City Council v. Sakai,* 58 Haw. 390, 570 P.2d 565 (1977) (joint representation). The fact is that Kainz was represented by separate independent counsel from the inception of the litigation.

Furthermore, Lussier has made absolutely no showing of prejudice to Mau-Van due to its representation by Ueoka & Luna. *See Pisa v. Commonwealth,* 378 Mass. 724, 393 N.E.2d 386 (1979) (once a case has gone to judgment, whether an impropriety has resulted in prejudice becomes a relevant consideration). *Cf. Wong v. Fong,* 60 Haw. 601, 593 P.2d 386 (1979); *Lau v. Valu-Bilt Homes, Ltd.,* 59 Haw. 283, 582 P.2d 195 (1978). In essence, Mau-Van's role in the case was that of a nominal party. As indicated above, Lussier targeted Kainz as the main culprit and the defensive burden was shouldered mainly by Kainz's counsel.

We find no abuse of discretion in the trial court's denial of Lussier's motion based on a conflict of interest. *See Sapienza v. Hayashi,* 57 Haw. 289, 294, 554 P.2d 1131, 1136, n.2 (1976); *Trone v. Smith,* 621 F.2d 994 (9th Cir. 1980). *Contra Woods v. Covington Country Bank,* 537 F.2d 804 (5th Cir. 1976) ("clearly erroneous" test applied).

### C. *Luna As A Witness*

Lussier contends that (1) since Luna knew or should have known that he would be a witness in the case, DR 5-101(B)[18] precluded him and his law firm from accepting the employment of Mau-Van and other defendants; (2) at the least, after

---

[18] DR 5-101(B) of the Code states:

A lawyer shall not accept employment in contemplated or pending litigation if he knows or it is obvious that he or a lawyer in his firm ought to be called as a witness, except that he may undertake the employment and he or a lawyer in his firm may testify:

(1) If the testimony will relate solely to an uncontested matter.

(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.

(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.

(4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.

undertaking employment in the case, when it became obvious that he may be called as a witness by Lussier, Luna and his law firm should have withdrawn from the case as cautioned by DR 5-102(B);[19] and (3) since Luna failed to voluntarily comply with the disciplinary rules, the trial court should have disqualified Luna and his law firm.

Whether Luna violated DR 5-101(B) may be the subject of a separate disciplinary complaint and proceeding. However, we have been unable to find a reported case wherein the judgment was reversed due to an acceptance of employment in violation of DR 5-101(B). Absent a showing of prejudice to Mau-Van or the other clients due to the acceptance of employment by Luna and his law firm, we do not find reversible error.

After undertaking employment, Luna was called as a witness "other than on behalf of his client" by Lussier. Under DR 5-102(B), Luna and his law firm could continue to represent Mau-Van and the other clients until it became apparent that his testimony was or would become prejudicial to Mau-Van and the other clients. *See United States v. Reeder,* 614 F.2d 1179 (8th Cir. 1980).

Concerning the probability of prejudice under DR 5-102(B), "the moving party bears the burden of demonstrating the likelihood that prejudice will or might result." *Freeman v. Kulicke & Soffa Industries, Inc.,* 449 F.Supp. 974, 978 (E.D. Pa. 1978), *aff'd,* 591 F.2d 1334 (3d Cir. 1979). It was incumbent upon Lussier to indicate to the trial court in what particulars Luna's testimony would be prejudicial to Mau-Van and his other clients. *See Rice v. Baron,* 456 F.Supp. 1361 (S.D. N.Y. 1978); *Kroungold v. Triester,* 521 F.2d 763 (3d Cir. 1975). Yet, Lussier had not taken Luna's deposition when he filed his motion for disqualification on August 18, 1980.[20] Any allegation of prejudice would have been mere speculation.

---

[19] DR 5-102(B) of the Code provides:
> If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client.

[20] Luna's depositions were taken on December 13, 1980 and December 26, 1980.

Lussier argues that (1) Luna did not testify "other than on behalf of his client" because under cross-examination he testified in support of Mau-Van; (2) thus, Luna testified "on behalf of his client"; and (3) consequently, DR 5-102(A),[21] rather than DR 5-102(B), was applicable. *See Chuck v. St. Paul Fire and Marine Insurance Co.,* 61 Haw. 552, 606 P.2d 1320 (1980); *Sheraton Hawaii v. Poston,* 51 Haw. 142, 454 P.2d 369 (1969). This argument is specious. Like any other witness, an attorney on the witness stand is subject to cross-examination and impeachment on any relevant matter. *Cottonwood Estates, Inc. v. Paradise Builders, Inc.,* 128 Ariz. 99, 624 P.2d 296 (1981). The fact that Luna's testimony on cross-examination was adverse to Lussier did not result in Luna being a witness "on behalf of his client."

The trial court did not abuse its discretion in denying Lussier's motion on the ground that Luna would be a witness in the case. *See Sapienza v. Hayashi, supra; Trone v. Smith, supra.*

### V. CONCLUSION

We reverse the trial court's granting of directed verdicts on the claims or issues set forth below and affirm the judgment in all other particulars:

1. Claim based on the underpricing of Project units released for marketing in May 1978 at prices below their fair market values (the directed verdict on the issue of premature marketing being affirmed) (Part II-A).

2. Claims based on the shareholders' suites (Part II-C).

3. Claims based on preferential suites A-101 and B-208 (Part II-D1).

---

[21] DR 5-102(A) of the Code reads:

If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm ought to be called as a witness on behalf of his client, he shall withdraw from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he or a lawyer in his firm may testify in the circumstances enumerated in DR5-101(B)(1) through (4).

4. Claim based on Lot-15, the one-acre lot, as to the Taylor and Forde offers (Part II-E2).

5. Claim based on Kainz's salary being voted upon by allegedly "dominated" Schlamann (the directed verdict as to Honigman begin affirmed) (Part II-F).

Remanded for further proceedings consistent with this opinion.

*Robert A. Smith* (*Richard L. Rost* with him on the briefs) for plaintiff-appellant.

*Ronald S. Adelman* for defendent-appellee Wilhelm Kainz.

*Everett Walton* (*B. Martin Luna* with him on the brief; *Ueoka & Luna,* of counsel) for defendants-appellees Mau-Van Development, Inc., Nick Germani, Sophie Koenig, Curt Schlamann, Arnold Honigman and Gerry Helfrich.